**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| TYLER ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:21-cv-00169-NT |
| | ) | |
| UNIVERSITY OF NEW ENGLAND, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT***

Before me is a motion for summary judgment from Defendant University of New England (ECF No. 53). For the reasons stated below, the motion is **GRANTED**.

## BACKGROUND

### I. Factual Background[1]

#### A. Anderson's Early Academic Performance at UNE

Tyler Anderson started school at the University of New England ("**UNE**") in the fall of 2015 with an "Early Assurance" designation for the Doctor of Pharmacy program. Def. UNE's Reply Statement of Material Facts ("**SMF**") ¶ 1 (ECF No. 71-2). In his first three years at UNE, Anderson struggled in his science courses. SMF ¶ 2. In June of 2017, UNE informed Anderson that he had not successfully progressed to

* This opinion is **SEALED** until 12:00 p.m. on October 15, 2024, to give the parties an opportunity to notify the Court, by sealed filings, whether any portion needs to be redacted because of confidentiality issues.

1 I have evaluated each statement of fact put forth by the parties, as well as responses, improperly labeled requests to strike, and improperly labeled responses to requests to strike. *See* Local R. 56. I recite here the relevant and properly supported facts in the light most favorable to Anderson as the non-moving party, consistent with the limits of Local Rule 56.

qualify for conditional acceptance or a guaranteed interview for the pharmacy program. SMF ¶ 3. That update did not otherwise affect his academic status in his major or as an undergraduate student. June 21, 2017 Doctor of Pharmacy Program Letter (ECF No. 47-2, at #366). By the 2017 fall semester, Anderson had earned a cumulative grade point average ("**GPA**") of 1.96. SMF ¶ 3.

**B. Anderson's Temper**

In addition to some difficulty academically, Anderson also struggled with his temper. According to Anderson's psychiatrist, when Anderson and his father Mark Anderson had conflicts, they would get "pretty severe," to the point that Anderson "was violent toward[s]" his father. SMF ¶ 30. In fact, Anderson's father called the police more than once when Anderson behaved aggressively towards him. SMF ¶¶ 31–32.

In December 2016, Anderson assaulted a college roommate who had allegedly been taunting or bullying him, which resulted in Anderson having to move to another dorm. SMF ¶ 33. In a July 17, 2018 visit with his psychiatrist, Anderson shared that his "temper was not in control." SMF ¶ 28. In the summer and fall of 2018, Anderson's psychiatrist repeatedly assessed his risk level for violence as high. SMF ¶¶ 34, 35, 38.

**C. Anderson's Conflicts with Suitemates**

In the fall of 2018, Anderson had conflicts with his UNE suitemates. From the start of the semester, disagreements arose about Anderson's conduct and behavior. SMF ¶ 42. For example, at least one of his suitemates objected to Anderson staying up late and loudly playing music and videogames. SMF ¶ 44; Decl. of A.M. ("**A.M.**

**Decl.**") ¶ 3 (ECF No. 54-4). Because of these problems, Anderson and his suitemates entered into a "suitemate agreement" in early or mid-September 2018. SMF ¶ 45. In the eyes of at least two of his suitemates, this agreement did not fix what they viewed as Anderson's disruptive behavior. SMF ¶ 45; A.M. Decl. ¶ 4; Decl. of J.B. ("**J.B. Decl.**") ¶ 5 (ECF No. 54-5). On November 5, 2018, Anderson and his suitemates had a mediation with a UNE residential coordinator to try to quell their conflicts. SMF ¶ 46; A.M. Decl. ¶ 4; J.B. Decl. ¶ 5. On November 18, 2018, two of Anderson's suitemates filed a residential complaint because they felt Anderson's behavior had escalated and they feared for their safety. SMF ¶ 47; UNE Incident Report Form (ECF No. 47-9, at #439).

UNE investigated the suitemates' residential complaint by collecting written statements and conducting interviews with all three of Anderson's suitemates. SMF ¶¶ 48–57. The suitemates' statements and interview summaries describe Anderson's drug use, boasts about getting away with beating up a former roommate, and playing videogames at high volume, among other conduct. SMF ¶¶ 51, 52, 54. One suitemate shared that he failed a teacher certification exam that he had paid for out of his own pocket because of the stress and anxiety caused by Anderson's behavior. SMF ¶ 55. Shane Long, then UNE's Director of Student Conduct, reviewed the summaries of the suitemates' interviews. SMF ¶ 58. Based on the nature of the suitemates' allegations, Long decided to remove Anderson from his suite temporarily and move him to a single room in another dorm. SMF ¶ 58.

On November 29, 2018, Long met with Anderson to inform him of the student conduct code charge against him and provide him with written notice of the charge. SMF ¶ 60. He also informed Anderson that he was under a no-contact order with his suitemates and would be moved to another dorm. SMF ¶¶ 61–62. Anderson was not happy with the change because the new dorm housed mostly freshmen (he was a senior), his room would be a single rather than a suite, he would have to use a shared bathroom, and he would not have air conditioning. SMF ¶ 273; Tyler Anderson Dep. ("**Anderson Dep.**") 105:21–106:10 (ECF No. 48-9, at #599). During this meeting, Anderson asked if he could call his father and Long said yes. SMF ¶ 63. Long overheard Mark Anderson telling his son that he needed to tell Long that his suitemates had threatened him. SMF ¶ 65. Anderson told Long, and Long said he would investigate Anderson's complaint. SMF ¶ 66. Long also overheard Mark Anderson instructing Anderson repeatedly to tell Long to "buckle up." SMF ¶ 66.

Days later, on December 3, 2018, Anderson's father called UNE security and reported that "students in [Anderson's suite] are going to stab people." SMF ¶ 280. The next day, Anderson met with UNE's Director of Safety and Security and reported that one of his suitemates handled a knife in front of him and said it could fit between his ribs. SMF ¶ 281. UNE conducted an investigation and determined that the suitemate had possessed a knife with a blade longer than permitted in UNE dorms, but had not threatened or intimidated anyone with it. SMF ¶¶ 71–74. UNE issued the suitemate a warning for this transgression. SMF ¶ 75.

**D. Anderson's Stay in an Off-Campus Hotel**

Shortly after he moved to the single dorm room, Anderson's father brought up the idea of Anderson moving off campus to a local hotel. SMF ¶ 278; Mark Anderson Dep. 178:5–8 (ECF No. 48-8, at #547). According to Anderson's father, his son did not feel safe in the new dorm room because other students had access to the building and "the issues with the knife were never addressed." Mark Anderson Dep. 177:7–20 (ECF No. 48-8, at #547). At his deposition, Anderson testified that he was not evicted from campus and that it was his or his father's choice that he live in a hotel. SMF ¶¶ 133–134; Anderson Dep. 152:6–153:1 (ECF No. 48-9, at #610–611). Anderson stayed at the hotel for two or three nights at UNE's expense. Mark Anderson Dep. 178:11–15, 179:11–17 (ECF No. 48-8, at #547). After that, Anderson moved home. Mark Anderson Dep. 178:16–19 (ECF No. 48-8, at #547).

**E. Anderson's Academic Support, Struggles in Biochemistry, and Conflict with Professor Small**

On the academic side of things, at the beginning of the fall 2018 semester, Anderson's father contacted UNE to ask for additional support for his son. SMF ¶ 5. Amy Keirstead, at the time an Associate Professor of Chemistry and the Interim Associate Dean of the College of Arts and Sciences, advised Mark Anderson about academic supports for his son. SMF ¶ 5. Keirstead testified that she and others were "making sure that there was a coordinated effort to support [Anderson] in his courses." Amy Keirstead Dep. 9:13–14 (ECF No. 48-12, #693).

In the fall of 2018, Anderson was one of sixty students in Professor Deena Small's Fundamentals of Biochemistry course. SMF ¶ 4. As part of the academic

support plan for Anderson, on September 19, 2018, Small emailed Keirstead and Professor Amy Deveau, Assistant Chair of the Department of Chemistry and Physics, that Anderson was struggling in her course. SMF ¶ 6. Small explained that Anderson had missed at least one class, his first lab partner had essentially done the lab herself and asked not to work with Anderson anymore, Small had been unable to get Anderson back on task during the second lab, and that he had scored 60/100 on the first two quizzes when the average on the first quiz was a 95. SMF ¶ 6. Keirstead responded and asked if Anderson had attended office hours or made an appointment with Small to get extra help, which was part of the support plan she had devised with Anderson and his father. SMF ¶ 7. Small replied that he had not. SMF ¶ 8.

On October 10, 2018, Anderson emailed Small: "I'm concerned with my comprehension of the material. I think I [*sic*] rather work by myself next lab. I don't feel like I'm learning anything by being in a group." SMF ¶ 12; Oct. 10, 2018 email from Anderson to Small (ECF No. 47-6, at #414). Small responded that it was not possible for Anderson to work by himself on a lab for several reasons and wrote:

> I have tried to make you feel more involved with your lab groups (which has changed for every lab set), but you come to lab unprepared (have not read the procedure) and even walked out of the lab lecture while I was going over procedure, concepts and the grading rubric for Lab 4. During the lab data crunching sessions, it was hard to keep you focused and on task while working on your portion of the lab. Same was true for the bioinformatics lab which you never completed your part. In all cases, you have not contributed anything more than a few sentences to the group report, yet you benefit from the final grade. You have yet to see me for help either in class or outside of class. One of the objects of this course is to work in groups, an important skill that requires shared effort for all involved.

> I suggest that you see me during office hours before the lab next week after you have read the procedure. I would be happy to help you stay involved with your group for this lab series, but it will take effort on your part to demonstrate that you want to be involved and can follow directions.

SMF ¶ 13; Oct. 11, 2018 email from Small to Anderson (ECF No. 47-6, at #413–414).

Anderson responded to Small:

> I find you to be very disorganized and unprepared as well so if you want to point out mutual qualities you are also very convoluted and scattered in discussions and you aren't easy to follow. I don't see you during office hours because I have 21 year olds that have an easier time explaining the material than you do. My desk is far more organized than yours. Take care. If I wanted to take advice from someone buried in there [*sic*] work I'd go to the graveyard first.

SMF ¶ 14; Oct. 11, 2018 email from Anderson to Small (ECF No. 47-6, at #413). Minutes later Anderson further responded to Small: "Also, I will be paying very close attention to your grading to ensure you don't cheat me on any points. Don't bother to reply. This discussion is over." SMF ¶ 15.

Small then contacted Don Clark, then the Director of Safety and Security at UNE, and reported that she was afraid of Anderson. SMF ¶ 19. Clark reviewed Anderson's October emails and responded that he viewed them as rude and inappropriate and could understand why they were alarming to Small, but he did not see them as presenting an imminent threat. SMF ¶ 20; Oct. 11, 2018 email from Clark to Small (ECF No. 47-8, at #416). On November 4, 2018, after Small received an additional email from Mark Anderson, she repeated her concerns about Anderson to Keirstead. SMF ¶ 22. On November 6, 2018, Keirstead informed Small that the UNE Behavioral Risk Assessment Committee ("**BRAC**") had reviewed the situation and did not consider Anderson to be an "imminent threat." SMF ¶ 23. Small continued to

express that she was concerned about Anderson's behavior and that he was a threat to her. SMF ¶ 24.

Because of Small's continued expressions of concern, on November 6, 2018, Keirstead communicated to Small that Clark could give her a personal panic button to wear on her person and use if she felt unsafe. SMF ¶ 25; Nov. 6, 2018 email from Keirstead to Small (ECF No. 47-13, at #424). Clark described it as similar to "a medical alert button" that Small could use if she "ever felt the need under duress." SMF ¶ 25; Clark Dep. Tr. 21:6–23 (ECF No. 48-13, at #730). Clark also offered to walk Small from the parking lot to class, which he recalled doing once. SMF ¶ 26.

On November 7, 2018, Anderson emailed Small and asked for a "retroactive medical leave" for "the opportunity to make up any homework and exams" he missed and "not lose points for lacking to come to class." SMF ¶ 92; Nov. 7, 2018 email from Anderson to Small (ECF No. 47-14 at #427). In his message, Anderson described a manic episode he had endured from around September 17, 2018 to October 7, 2018. Nov. 7, 2018 email from Anderson to Small (ECF No. 47-14 at #427). The next day, Small responded that she empathized with his situation but could not grant the request. SMF ¶ 93. She explained that Biochemistry was a foundational science course required for his major and his performance indicated that he had not mastered the material. SMF ¶ 93. She recommended that he withdraw from the course and retake it again with fresh eyes. SMF ¶ 93. Small further advised Anderson that his present grade bordered between a "D" and an "F," and that if he withdrew immediately, she could assign him a grade of "Withdraw Passing," which would not

affect his GPA. SMF ¶ 94; Nov. 8, 2018 email from Small to Anderson (ECF No. 47-14 at #426). But, she explained, if Anderson waited longer to withdraw, he would risk a "Withdraw Failing" grade, which could have a significant negative impact on his GPA. SMF ¶ 94; Nov. 8, 2018 email from Small to Anderson (ECF No. 47-14 at #426).

Later that afternoon, on November 8, 2018, Anderson responded to Small:

> I disagree with you. Further I will have this discussion taken to the next level. If need be my father said that he will get an attorney involved. The attorney would involve a personal suit and not let you be eligible for the use of the school[']s attorney.
>
> Look, you have made several nuances plus outright unprofessional behaviour some of your actions are considered unethical. Throughout the semester you had a personal issue with me. I believe this issue should be removed from your decision making under the circumstances. Our relationship has reached an irretrievable break down. All future papers will now be reviewed by the department head per my request.
>
> You can not disregard someone's disability or illness.
>
> My father will be calling the university tomorrow to file a complaint. Buckle up!

Nov. 8, 2018 email from Anderson to Small (ECF No. 47-14, at #425).

### F. Anderson's Title IX Complaint Against Small and its Aftermath

Less than two hours after he sent the November 8, 2018 email to Small, Anderson emailed the following message to Brittany Swett, a UNE Title IX investigator, and Stine Brown, an Associate Dean of Faculty Affairs in UNE's College of Arts and Sciences, with a copy to his father:

> I have been sexually harassed by a professor at UNE. The professor is Deena Small.
>
> She is currently my Bio-Med instructor.

> Details and account of the harassment will first be discussed with a professional outside of UNE first.
>
> Once I receive council [*sic*], I will proceed in the direction I am advised.
>
> In the meantime, under title IV [*sic*], I would like intervention from the school in preventing further occurrence of such acts.
>
> My next class is this Friday at 11:00. I am hesitant to attend. I will speak to my own Psychologist outside of UNE.
>
> I would prefer we kept all communication through email, so I may have a record.

SMF ¶ 96. Anderson forwarded this message to Small with a copy to Brown and wrote:

> The following email was sent to the proper authorities.
>
> In the meantime, I demand you cease and desist from further sexually harassing me. At this point I do not want to be alone with you. Any needed communication must have a third party present.
>
> You shall not contact me or approach me in any manner.
>
> I will request the head of your department review coursework and advise me on completing this class.
>
> Any retaliation on your part will be documented.

SMF ¶ 97.

On November 12, 2018, at Small's request, Clark walked Small to class and gave her the personal panic button. SMF ¶¶ 187–188; Nov. 12, 2018 email from Small to Clark (ECF No. 48-23, at #767). At some point after Anderson made his Title IX complaint, a student saw Small's panic button and asked her what it was. SMF ¶ 189; Small Dep. 52:2–52:19 (ECF No. 48-11 at #671). Small did not recall how she responded. Small Dep. 52:20–53:2 (ECF No. 48-11 at #671–672). A student also asked

Small why she had an escort and Small responded that there was a student who was threatening her. SMF ¶¶ 190–191, 196.[2] The student put "two and two together" and realized Small was referring to Anderson. SMF ¶ 125. Several classmates told Anderson that they heard Small needed a bodyguard because Anderson had threatened her. SMF ¶ 199[3]; Anderson Dep. 80:5–23 (ECF No. 48-9, at #592).

On November 13, 2018, Angela Shambarger, UNE's Title IX Coordinator, emailed Anderson informing him that UNE had begun its investigation into his complaint against Small. SMF ¶ 99. Shambarger provided Anderson with academic points of contact should he need assistance during the investigation. Nov. 13, 2018 email from Shambarger to Anderson ("**Shambarger Email**") (ECF No. 47-16, at #429). One of those contacts was John Stubbs, the Chair of the Chemistry and Physics Department. SMF ¶ 101; Shambarger Email (ECF No. 47-16, at #429). Shambarger further wrote:

> I know you have class scheduled tomorrow at 11. You can absolutely go to class as normal. Dr. Stubbs will also be there as a resource and support. When you and I meet tomorrow, one of the things we will do is explore other ways for you to participate in the course/materials without having Dr. Small as your direct instructor. When I spoke with your father on Friday, he had indicated that this would be something you would be interested in.

---

[2] UNE objected to each of these statements of fact as inadmissible hearsay. I interpret these "objections" as requests to strike. *See* Local R. 56(e). I deny UNE's requests to strike because these statements could be admissible not for their truth, but to show their effect on the listener. *U.S. v. Castro-Lara*, 970 F.2d 976, 981 (1st Cir. 1992) ("The hearsay rule does not pertain to statements adduced merely to show that they were made or that they had some effect on the future actions of a listener.").

[3] UNE's request to strike this statement of fact is denied for the reasons explained above. *See supra* n.2.

Shambarger Email (ECF No. 47-16, at #429). Small was the only professor teaching Biochemistry that semester. SMF ¶ 110. UNE gave Anderson the choice of attending Small's class in-person or remotely by livestream or videotape. SMF ¶¶ 112–113. UNE also proposed that Anderson's lab could be taught by a teaching assistant with Stubbs and another professor serving as his points of contact. SMF ¶ 111.

In an email, Stubbs relayed that he had been attending Small's class since November 9, 2018 and sat in the same spot each day. Nov. 14, 2018 email from Stubbs to Kierstead (ECF No. 60-10, at #975–976). According to Stubbs, on November 14, 2018, Anderson arrived at Small's class after Stubbs and sat next to him, with one empty chair between them. Nov. 14, 2018 email from Stubbs to Kierstead (ECF No. 60-10, at #976). At his deposition, Anderson testified that he did not know who Stubbs was, had never met him, and did not sit next to him. SMF ¶ 104; Anderson Dep. Tr. at 161:11–162:2 (ECF No. 48-9, at #613). He further testified that he only knew Stubbs had been in Small's class because people told him. Anderson Dep. Tr. 161:21–23 (ECF No. 48-9, at #613).[4]

On November 16, 2018, Anderson began attending Small's class remotely. SMF ¶ 194. Several classmates asked Anderson why he was not in class. SMF ¶ 198. Some of these same classmates told Anderson that they understood that he was not in class because of his dispute with Small. SMF ¶ 195.[5] Around December 5, 2018, Anderson

---

[4] In an affidavit submitted about seven months after his deposition, Anderson asserted: "Professor Stubbs sat beside me in Professor Small's class. I did not recognize Professor Stubbs, and I had never seen the man sit in on any other classes or labs." Anderson Aff. ¶ 6 (ECF No. 62, at #981).

[5] UNE's requests to strike statements of fact 195 and 198 are denied for the reasons explained above. *See supra* n.2.

withdrew from Biochemistry with a "Withdraw Passing" designation backdated, even though the deadline for withdrawing with that designation had passed. SMF ¶ 118.

### G. Anderson's Conduct Investigation

On November 13, 2018, Keirstead emailed Long to request that he start a "conduct investigation" into Anderson. Nov. 13, 2018 email from Keirstead to Long ("**Keirstead-Long Email**") (ECF No. 49-17, at #805). The request was based on a conversation at a regularly scheduled BRAC meeting and four enumerated "observations/reports" about Anderson. Keirstead-Long Email (ECF No. 49-17, at #805); Long Decl. ¶¶ 5–8 (ECF No. 71-3, at #1380). Two involved Small: reports that Anderson was "being aggressive with Deena Small, slamming papers on the desk when he hands things in" and "posting content about [Small] on some forum." Keirstead-Long Email (ECF No. 49-17, at #805). The other two—reports of Anderson slamming a door in his residential advisor's face and abusing drugs—did not. Keirstead-Long Email (ECF No. 49-17, at #805). No forum posts about Small were ever found, and it appears that the allegation actually referred to an October 2018 email exchange between Anderson and Small that a student had reviewed on another student's phone. SMF ¶¶ 231; Title IX report (ECF No. 48-6, at #489). Long never received any written reports or formal complaints on the allegations against Anderson in Keirstead's email and did not pursue the matters any further. Long Decl. ¶¶ 7–9 (ECF No. 71-3, at #1380–1381).

### H. Anderson's Withdrawal from UNE and UNE's Title IX Report

On January 12, 2019, Anderson withdrew from UNE with a last day of attendance of December 9, 2018. SMF ¶ 119. UNE did not issue an academic

expulsion or suspension to Anderson or prevent him from enrolling in the spring 2019 semester. SMF ¶ 120.

On January 29, 2019, Shambarger issued her Title IX report on Anderson's complaint and concluded by a preponderance of the evidence that Small did not violate UNE's sexual harassment policy. SMF ¶ 115.

## II. Procedural History

In June of 2021, Anderson filed suit in this Court. Pl.'s Compl. for Harassment, Retaliation, Breach of Contract and Constitutional Violations (ECF No. 1). UNE moved to dismiss the Complaint. Def. UNE's Mot. to Dismiss (ECF No. 7). Anderson did not oppose dismissal of four of the eight counts in his original Complaint, and the Court dismissed those four counts. Pl.'s Opp'n to Def.'s Mot. to Dismiss 2 n.1 (ECF No. 11); Order on Mot. to Dismiss 1, 3 (ECF No. 15). Anderson requested, and the Court granted, leave to amend his complaint to plead additional facts to support his four unconceded claims. Pl.'s Opp'n to Def.'s Mot. to Dismiss 6 n.2; Order on Mot. to Dismiss 1–4 (ECF No. 15). In February of 2022, Anderson filed his Amended Complaint. Pl.'s Am. Compl. for Negligence[,] Title IX Harassment, and Retaliation, Breach of Contract ("**Am. Compl.**") (ECF No. 16). This prompted a new motion to dismiss from UNE, Def. UNE's Mot. to Dismiss Pl.'s Am. Compl. (ECF No. 18), which resulted in dismissal of two of the four remaining claims. Order on Mot. to Dismiss (ECF No. 23).

Following discovery, UNE filed a notice of intent to file a motion for summary judgment. Def. UNE's Notice of Intent to Move for Summ. J. (ECF No. 36). The parties filed Local Rule 56(h) memoranda and I held a Local Rule 56(h) conference. Def.

UNE's Summ. J. Pre-Filing Mem. (ECF No. 38); Pl.'s Responsive Pre-Filing Conference Mem. (ECF No. 39); Local Rule 56(h) Pre-Filing Conference Report & Order (ECF No. 41). Between this conference and the filing of his opposition to summary judgment, Anderson decided not to further pursue one of his two remaining claims. Pl.'s Mem. of Law in Resp. to Def.'s Mot. for Summ. J. . ("**Pl.'s Opp'n**") 13 n.2 (ECF No. 63). The present motion for summary judgment thus concerns Anderson's only remaining claim: Title IX retaliation.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence 'is such that a reasonable jury could resolve the point in the favor of the non-moving party . . . .' " *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021) (quoting *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 7 (1st Cir. 2018)). "[A]nd a fact is 'material' if it 'has the potential of affecting the outcome of the case[.]' " *Id.* (quoting *Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 25 (1st Cir. 2011)).

Moreover, on a motion for summary judgment, the record must be viewed in the light most favorable to the nonmoving party and all reasonable inferences must be drawn in his favor. *EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 57 (1st Cir. 2021). However, "[a]n inquiring court is not obliged either 'to draw unreasonable inferences or credit bald assertions or empty conclusions.' "

*Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 348 (1st Cir. 2018) (quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)).

## DISCUSSION

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). This law includes a prohibition on "[r]etaliation against a person because that person has complained of sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).

Where there is no direct evidence of retaliation, courts evaluate Title IX retaliation claims using the three-step burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Theidon v. Harvard Univ.*, 948 F.3d 477, 505 (1st Cir. 2020). For step one, Anderson must establish a prima facie case of retaliation by showing that (1) "[he] engaged in protected conduct; (2) [he] was subjected to an adverse [educational] action; and (3) the adverse [educational] action is causally linked to the protected conduct." *Ing v. Tufts Univ.*, 81 F.4th 77, 84 (1st Cir. 2023) (internal citations and quotations omitted). In this context, "[a]n adverse action is one that is severe enough to 'dissuade a reasonable person from making or supporting a charge of discrimination.' " *Hewes v. Pangburn*, No. 1:21-cv-00125-JDL, 2022 WL 823924, at *9 (Mar. 18, 2022) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). If Anderson makes this prima facie showing, at step two UNE must articulate a legitimate, non-retaliatory reason for its action. *See*

*Theidon*, 948 F.3d at 495. If UNE produces such a reason, at step three the burden shifts back to Anderson to show that UNE's stated reason is pretextual and that the actual reason for the adverse educational action was retaliation. *Id.* at 496. The causation standard for Title IX claims is either "but for" or "substantial or motivating factor." *Ing*, 81 F.4th at 84 n.5 (describing the Title IX causation standard as "an unresolved question in this circuit").[6]

Here, UNE claims that it is entitled to summary judgment because Anderson cannot satisfy elements two or three of the prima facie case. Def.'s Mot. for Summ. J. ("**Def.'s Mot.**") 9–17, 10 n.2 (ECF No. 54-1). UNE further claims that even if Anderson could establish a prima facie case, UNE's stated reasons for its actions were not pretext for retaliatory animus.[7] Def.'s Mot. 17–18.

Before I delve into my analysis, I address some confusion about what the asserted adverse actions are in the first place. UNE's motion for summary judgment proceeds as if the asserted adverse actions are those listed in the Amended Complaint. Def.'s Mot. 11; *see* Am. Compl. ¶ 64.[8] Anderson's opposition to summary

---

6 As becomes clear below, this case does not call for a resolution of this open question.

7 UNE also argues that it cannot be liable under Title IX for any alleged adverse actions by an employee who did not have authority to address the conduct and institute corrective measures. Def.'s Mot. for Summ. J. 10, 11 (ECF No. 54-1) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998)). I do not reach this argument because I find that Anderson's claims stall out in the *McDonnell Douglas* burden-shifting process.

8 Anderson's Amended Complaint alleges that the adverse "school related actions include UNE['s] negligent response to Anderson's complaint, UNE intentionally created a false perception of Anderson as a threat on campus, UNE intentionally fueled the false perception of Anderson as a safety threat, UNE evicted Anderson from his dorm, UNE evicted Anderson from campus, UNE forced Anderson to withdraw from UNE." Pl.'s Am. Compl. for Negligence[,] Harassment, and Retaliation, Breach of Contract ¶ 64 (ECF No. 16).

judgment begins with a "Summary of Facts" section that covers a wide range of conduct, including conduct well outside the scope of the adverse actions alleged in his Amended Complaint. Pl.'s Opp'n 1–13. His brief then proceeds to a "Legal Analysis" section that addresses the Title IX retaliation claim specifically. Pl.'s Opp'n 13–20. In that section, he lists and addresses five distinct adverse actions. Pl.'s Opp'n 14–17. This list omits one adverse action alleged in the Amended Complaint ("UNE['s] negligent response to Anderson's complaint") and adds an adverse action not mentioned in the Amended Complaint ("UNE commenced a retaliatory complaint against Anderson"). Am. Compl. ¶ 64; Pl.'s Opp'n 14–17. Otherwise, the legal analysis section basically addresses the adverse actions alleged in the Amended Complaint.

In reply, UNE accuses Anderson of improperly asserting new and unpled theories of liability in his opposition to summary judgment. Def.'s Reply in Supp. of its Mot. for Summ. J. ("**Reply**") 1–2 (ECF No. 71-1). For example, UNE interprets Anderson's fact section recitation of his efforts to get a medical accommodation as an attempt to assert an entirely new legal theory. Reply 1–2; *see* Pl.'s Opp'n 3–4. I do not read it that way. The legal analysis section of Anderson's opposition states the adverse actions clearly and unequivocally. Pl.'s Opp'n 14 ("The adverse actions are addressed below."). I do not view the recitation of facts that comes before it as an attempt to assert new legal theories or claims.[9] I hold Anderson to the adverse actions

[9] In any event, that attempt would fail. "Plaintiffs may not 'raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment.' " *Miranda-Rivera v. Toledo-Dávila*, 813 F.3d 64, 76 (1st Cir. 2016) (quoting *Calvi v. Knox Cnty.*, 470 F.3d 422, 431 (1st Cir. 2006)).

he addresses in the analysis section of his brief.[10] That predicate issue now resolved, I proceed to the merits and address each of Anderson's asserted theories of liability within his Title IX retaliation claim.

## I. "UNE evicts Anderson from his dorm suite"[11]

Anderson asserts that UNE retaliated against him by making him move out of his suite. The parties agree that requiring Anderson to move from his suite to a different dorm room meets the Title IX adverse action standard. Def.'s Mot. 16; Pl.'s Opp'n 14. The question, then, is whether there are any disputed issues of material fact on the causation element.

The record shows that Anderson had issues with his suitemates from the start of the fall 2018 semester. Before Anderson made his Title IX complaint, he and his roommates entered into a "suitemate agreement" in September 2018, and when that did not fix their issues, they had a mediation with a residential coordinator on

---

10 That means I do not consider the adverse action Anderson alleged in his Amended Complaint but did not list or otherwise address in the analysis section of his brief ("UNE['s] negligent response to Anderson's complaint"). *See Bus. Credit Leasing, Inc. v. City of Biddeford*, 770 F. Supp. 31, 34 n.4 (D. Me. 1991) ("As this Court has often noted, issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotations and citations omitted), *aff'd*, 978 F.2d 767 (1st Cir. 1992).

A closer question is whether I should consider the adverse action absent from Anderson's Amended Complaint, but listed and addressed in the analysis section of his brief ("UNE commenced a retaliatory complaint against Anderson"). On the one hand, Anderson may not raise an entirely new theory of liability in his opposition to summary judgment. *See Miranda-Rivera*, 813 F.3d at 76. On the other hand, Anderson may "oppose summary judgment by pointing to even more evidence of [UNE]'s retaliatory practices that were revealed in discovery than what [he] alleged in [his] complaint. *Doe v. Univ. of Ky.*, 111 F.4th 705, 715 (6th Cir. 2024). As best I can tell, Anderson is pursuing multiple theories of liability within his single Title IX retaliation claim. Out of an abundance of caution, I will address the adverse action absent from his Amended Complaint but addressed in his opposition to summary judgment.

11 Due to the confusion among the parties about Anderson's asserted adverse actions, I quote them directly from Anderson's opposition brief in each heading in this section.

November 5, 2018. On November 18, 2018, ten days after Anderson made his Title IX complaint, his suitemates filed a residential complaint against him, which UNE investigated. One outcome of that complaint and investigation was UNE's decision to move Anderson out of his suite and into a different dorm.

On the record before me, I cannot find any links between Anderson's Title IX complaint and his move to a new dorm. For his part, Anderson makes conclusory arguments and disputes whether UNE was right that Anderson posed a threat to his suitemates. Pl.'s Opp'n 18. Regardless of who was right on that question, there is no dispute that Anderson and his suitemates had ongoing conflict and that his suitemates felt threatened by him. Anderson has simply not pointed to any connection between his Title IX complaint and his dorm removal. Anderson has not established the causation element of the prima facie case.

However, even if he had met the modest prima facie case standard, UNE has articulated a non-retaliatory reason for its action: Anderson's long-standing conflict with his suitemates, including their complaints that Anderson was intimidating them. Def.'s Mot. 17. This conflict had been ongoing for about two months when Anderson made his Title IX complaint. Anderson has not shown the existence of any disputed issues of material fact on whether this reason was pretextual and that the real reason was retaliatory animus for his filing a complaint alleging sexual harassment by Small.[12] On this record, no reasonable juror could conclude that UNE

[12] UNE did inform Anderson of the dorm removal just weeks after he made his Title IX complaint. But in this case, temporal proximity, by itself, does not create a genuine issue of material fact,

removed Anderson from his suite in retaliation for Anderson's filing of a Title IX complaint.

**II. "UNE portrayed Anderson as a threat on campus"**

Anderson asserts that UNE retaliated against him for filing a Title IX complaint by portraying him as a threat on campus. Specifically, Anderson points to:

- Small receiving the panic button from Clark and having him walk her to class,
- Small telling a student who asked about Clark that a student was threatening her,
- Stubbs sitting in on Small's class (once a seat away from Anderson), and
- students asking Anderson why he was not present in Biochemistry and telling him they understood it was because of his dispute with Small (a dispute that required her to get a bodyguard because Anderson had threatened her).

Pl.'s Opp'n 5–7, 15.

With respect to the panic button and escort, I do not see how these protections for Small amount to an adverse action against Anderson. Even if they did, Small's reports that she was afraid of Anderson and Clark's offer to provide the panic button and escort predated Anderson's Title IX complaint. And, even if Anderson could meet his prima facie case burden, UNE has presented a non-retaliatory rationale for its actions: responding to Small's reports that she felt threatened by Anderson. The record is clear that Anderson's psychiatrist assessed his risk level for violence as high during this time frame. The record is similarly clear that his suitemates felt threatened by him. Anderson and his father had gotten into physical altercations that

particularly where "the larger picture undercuts any claim of causation." *López-Hernández v. Terumo P.R. LLC*, 64 F.4th 22, 31 (1st Cir. 2023).

required involvement by law enforcement. Anderson's emails to Small included a reference to a graveyard and told her to "buckle up!" Providing Small with a panic button and a one-time escort to class in response to what the record undisputably shows was a well-founded fear did not constitute retaliation against Anderson for filing a Title IX complaint.

With regard to Small telling a student that another student was threatening her when asked why she had an escort to class, this does not amount to an adverse action by UNE against Anderson. While comments and questions by school personnel following a Title IX complaint can amount to adverse educational actions in some circumstances,[13] here they are insufficient. First, Small never mentioned Anderson by name; it was the inquiring student who inferred that she was referring to Anderson. Second, Small's report that she was afraid of Anderson predated his Title IX complaint. On this record, a single comment by a professor that did not even identify Anderson is not the sort of materially adverse conduct that would dissuade a reasonable student from making a Title IX complaint. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68.

With respect to Stubbs sitting in on Small's class, UNE made this arrangement as part of a support plan for Anderson to help him feel comfortable attending

---

[13] For example, in *Hewes v. Pangburn*, an athletic director probed a colleague about a Title IX complainant's sexual history without any educational purpose for the inquiry. 1:21-cv-00125-JDL, 2022 WL 823924, at *9 (D. Me. Mar. 18, 2022). This conduct, which was alleged to be intended to "smear [the complainant's] reputation and character" took place after the complainant filed her Title IX claim. The district court, in denying a motion to dismiss, considered this conduct sufficient to constitute an adverse educational action. *Id.*

*Hewes* is distinguishable. Small's internal communications to her colleagues about Anderson, which followed her administrative chain of command and were an attempt to get some protection, are not like a teacher's communication with a colleague about the sexual history of a student.

Biochemistry after his Title IX complaint. Moreover, UNE gave Anderson a variety of options for how to stay engaged in Biochemistry after his complaint, including attending class in-person with another adult present, or remotely so as to avoid Small entirely. Stubbs sitting in on a sixty-person class, once near Anderson, does not constitute an adverse educational action against Anderson.

And finally, Anderson's classmates' comments and questions about his dispute with Small and her escort to class are not adverse actions by UNE. The record is clear that none of these comments or questions were made by UNE personnel. Moreover, this asserted adverse action stems from Anderson attending Biochemistry remotely and Small's one-time escort to class, neither of which are themselves adverse educational actions by UNE against Anderson.

In sum, on this record, no reasonable juror could conclude that UNE retaliated against Anderson by portraying him as a threat on campus.

## III. "UNE commenced a retaliatory complaint against Anderson"

Anderson maintains that UNE retaliated against him for filing a Title IX complaint by initiating a complaint against him. Pl.'s Opp'n 7–11, 15. He does not identify which complaint he maintains was retaliatory in the analysis section of his brief. Pl.'s Opp'n 15. However, I infer from the fact section that precedes it that he refers to both (1) the November 12, 2018 report by Small that Anderson made negative posts about her on a student forum, and the additional complaints against Anderson that were detailed in Keirstead's November 13, 2018 "conduct investigation" email, and (2) the November 28, 2018 email from Long to Anderson

concerning the formal complaint Anderson's suitemates filed against him. Pl.'s Opp'n 7–11.

With respect to the first complaint, Anderson appears to take issue with how UNE handled the allegations in the Keirstead email, for example not apprising him of the allegations or keeping him informed about any investigations. *See* SMF ¶¶ 232, 235; Pl.'s Opp'n 9. According to UNE, the allegations in Keirstead's email did not rise to the level of a written report or formal complaint, so they did not trigger full-blown investigations. Long Decl. ¶¶ 8–9 (ECF No. 71-3, at #1380–#1381). There is no indication in the record that UNE imposed any consequences on Anderson as a result of the allegations in the Keirstead email. Anderson has not pointed to any evidence in the record that would suggest that these complaints against him went further than the Keirstead email itself. Anderson has not met the adverse educational action element of the prima facie case.

With respect to the second complaint, Anderson again takes issue with how UNE handled his suitemates' complaint. Pl.'s Opp'n 9–11. For the reasons discussed above, no reasonable juror could find that Anderson's Title IX complaint was the "but for" cause or a "substantial or motivating factor" for his suitemates' complaint. *See Ing*, 81 F.4th at 84 n.5. Nor could a reasonable juror find the requisite causal links between UNE's investigation of the suitemates' complaint and Anderson's Title IX complaint.

UNE did not retaliate against Anderson by summarizing complaints made against him from a variety of sources in the Keirstead email and investigating the suitemates' formal complaint against him.

## IV. "UNE actions force Anderson to move to a hotel"

Anderson next contends that UNE's actions forced him to move to a hotel. Pl.'s Opp'n 11–12, 15–16. The record is clear that Anderson moved to an off-campus hotel after his father requested it. UNE did not initiate or require the move. In other words, the move to the hotel was not something UNE did to Anderson, it was something he (or he through his father) asked the school to provide. So, while in the abstract, forcing a student to move to an off-campus hotel could well meet the adverse action standard, that is just not what happened here. Anderson's two- or three-night stay in a hotel at his father's request and at UNE's expense does not constitute an adverse educational action by UNE.

And, even if Anderson's brief stay in a hotel could be construed as an adverse action, the record is devoid of any causal link between his Title IX complaint and his move off-campus. Instead, the undisputed evidence shows that Anderson's father requested the move because of fears for his son's safety arising from conflicts with his former suitemates. Based on the undisputed facts in this case, no reasonable juror could find that UNE retaliated against Anderson for making a Title IX complaint when it paid for him to stay briefly and voluntarily at an off-campus hotel.

## V. "UNE compels Anderson to withdraw from UNE"

Anderson maintains that UNE retaliated against him by leaving him no choice but to withdraw from school. Pl.'s Opp'n 13, 16–17. UNE responds that constructive

expulsion is not a recognized Title IX adverse action, and even if it was, the facts in this case do not support it. Def.'s Mot. 14–15. Though the parties have not cited any examples in this circuit of a court recognizing a constructive expulsion adverse action, the First Circuit has repeatedly turned to Title VII for guidance in answering Title IX questions of first impression. *See Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65–66 (1st Cir. 2002) (collecting cases). And "constructive discharge"—"working conditions so intolerable that a reasonable person would have felt compelled to resign"—has long been a recognized adverse action in the employment context under Title VII. *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). Moreover, at least one federal district court has acknowledged that, while it is a novel theory, constructive expulsion may constitute an adverse action under Title IX. *See Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332, 381 (W.D. Pa. 2008). Thus, assuming constructive expulsion is a legitimate adverse action under Title IX, I proceed to whether a genuine dispute of material fact exists on whether Anderson's educational conditions at UNE were so intolerable that a reasonable student would have felt compelled to withdraw.

UNE argues that no reasonable juror could find that it created conditions that were so onerous, abusive, or unpleasant that a reasonable person in Anderson's position would have felt compelled to withdraw from school. Def.'s Mot. 14–15 (citing *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 96 (1st Cir. 2018)). Anderson responds in conclusory fashion, without pointing to any facts from the record, let alone facts that would create a genuine issue of material fact on whether he can meet

the constructive expulsion standard. Pl.'s Opp'n 16–17. Nor can I find, based on my review of the record, facts that would even come close to generating a genuine issue of material fact on the relevant standard. For example, the record shows that UNE took interim measures once Anderson made his Title IX complaint to protect him while the school conducted its investigation. UNE provided Anderson with academic contacts, allowed him to attend Biochemistry in-person or remotely, and offered alternatives for completing his labs.

The record is clear that Anderson struggled mightily at UNE. However, the record is similarly clear that these struggles were not the result of conditions created by UNE, let alone conditions that were so onerous, abusive, or unpleasant that Anderson had no choice but to withdraw. No reasonable juror could find that UNE retaliated against Anderson by compelling him to withdraw from school.

## CONCLUSION

For the reasons stated above, Defendant UNE's motion for summary judgment (ECF No. 53) is **GRANTED**.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 30th day of September, 2024.